611 N.E.2d 1374 (1993)
234 Ill. App.3d 853
183 Ill.Dec. 726
The PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
Leon GULLY, Defendant-Appellant.
No. 5-91-0675.
Appellate Court of Illinois, Fifth District.
April 13, 1993.
*1376 Robert Agostinelli, Deputy Defender, Mark D. Fisher, Asst. Defender, Office of the State Appellate Defender, Third Judicial Dist., Ottawa, for defendant-appellant.
Robert Haida, State's Atty., St. Clair County, Belleville, Norbert J. Goetten, Director, Stephen E. Norris, Deputy Director, Rebecca Sanders, Staff Atty., Office of the State's Attys. Appellate Prosecutor, Mt. Vernon, for plaintiff-appellee.
Justice RARICK delivered the opinion of the court:
Following a jury trial, defendant, Leon Gully, was convicted of aggravated kidnapping, armed robbery, and aggravated criminal sexual assault. He was sentenced to concurrent terms of imprisonment of 10 years for aggravated kidnapping, 20 years for armed robbery, and 25 years for aggravated criminal sexual assault. Defendant's convictions and sentences were affirmed on appeal. People v. Gully (1986), 151 Ill. App.3d 795, 104 Ill.Dec. 431, 502 N.E.2d 1091.
Thereafter, defendant filed two pro se post-conviction petitions; appointed counsel filed an amended post-conviction petition. Pursuant to an evidentiary hearing, the amended petition for post-conviction relief was denied. Defendant appeals and raises two issues for our review: (1) whether the trial prosecutor committed reversible error by violating the advocate-witness rule and by failing to perfect impeachment of an alibi witness and (2) whether defendant was denied a fair trial by the prosecution's use of inflammatory expert opinion testimony. We affirm the circuit court's order denying post-conviction relief.
On December 14, 1984, at about 12:30 a.m., the victim was driving home from her job at the National Stockyards Inn near East St. Louis, Illinois. At a stop sign, she pulled up behind another car. When the car in front of her did not proceed through the intersection, the victim began to back up in order to pull around the front car. However, the car in front backed up into her car. The driver of the front car approached the victim and apologized for backing into her car. At this point the victim became suspicious, and as she tried to leave the scene, two male passengers from the front car pulled a gun on her and forced her to unlock the car doors. They entered the car and shoved her head down. One of the two men removed her jewelry while the other man turned her car around and started driving back towards East St. Louis. The victim was taken to a vacant dead-end street. At this point, the driver of the front car pulled up and told the two men he did not want any part of what they were doing; the driver left the scene. The two men then ordered the victim to get into the back seat and remove her clothes. One of the men had intercourse with the victim while the other made her engage in oral sex. After the first man left the car, the second man then had intercourse with the victim. The first man opened the car door and asked "Jules or Julian" to give him his pants. "Jules" threw the pants from the car and told "Leon" to shut the door. During this exchange, the victim was able to see "Leon's" face in the car's dome light. (People v. Gully (1986), 151 Ill.App.3d 795, 797, 104 Ill.Dec. 431, 433, 502 N.E.2d 1091, 1093.) The victim was then allowed to dress and ordered to search for the car keys which the men had dropped. She found the keys and handed them to "Leon," whose face she again observed at this time. The victim was then ordered to walk toward the woods. Once she reached the woods, the victim ran to the interstate, where she flagged down a motorist who took her to the National City Police Department. The victim was then taken to St. Elizabeth's Hospital in Granite City, where a nurse used a Vitullo rape kit to obtain a vaginal swab and smear which was later submitted for forensic analysis. East St. Louis police officers recovered the victim's car.
*1377 In her initial statements to the authorities, the victim stated that all three men in the car which hit hers were armed. She later testified that that was incorrect; only the two men who got into her car were armed, but the driver of the other car was not. One man was armed with a longbarrelled.38- or .44-caliber revolver. The other man had a snub-nose .38-caliber revolver. The victim described "Jules" as 5'8" or 5'9", slender, 160 pounds, light complected with short hair, and clean shaven. She described "Leon" as 5'9" or 5'10", stocky, 180 to 185 pounds, 27 or 28 years old with a round face, a medium Afro, and darker complected than "Jules." She later testified that the descriptions of Jules and Leon were reversed and that she could identify Leon but not Jules. On the same day as the assault, the East St. Louis police department received a telephone call from someone claiming knowledge of the crimes. The caller identified Leon Gully, Terry Lewis, and Jackie Wilson as the three men involved in the robbery and assault. The police identified the caller as Kenneth Chaney. Pursuant to questioning, Wilson implicated defendant, Lewis, and Chaney as the three men involved in the offenses. Pursuant to Chaney's call, the police arranged a photographic array for the victim to view. Fourteen days after the assault, the victim viewed a 60-photograph array and identified defendant as the assailant named "Leon." Defendant is 5'4" or 5'5", weighs 155 pounds, and is three inches shorter than Chaney. Parenthetically, we note that Chaney was subsequently convicted and sentenced for his part in the assault and robbery.
Terry Lewis, a convicted burglar, testified at trial to a conversation he had had with defendant shortly before Christmas 1984. Lewis testified that defendant told him that he and Chaney had taken jewelry from a woman and were going to sell it to a pawn shop.
Jackie Wilson, also a convicted burglar, testified that he was the driver of the car on the night of December 14, 1984. He testified that he tried to convince defendant and Chaney not to harm the woman; Wilson fled because he did not wish to get into any more trouble. Wilson further testified that the next day defendant told him that he and Chaney had raped the woman and Chaney had taken her jewelry. Defendant also told Wilson that Chaney had called him by name during the incident. Wilson testified that defendant and his girlfriend, Rachelle Rogers, had asked him not to testify.
Susanne Davis testified that she purchased a ring from Rachelle Rogers for $40 shortly before Christmas 1984. The victim identified the ring as one of the pieces of jewelry taken in the robbery. Rogers testified that Chaney brought the rings to her home and defendant told her she could wear the rings. Rogers admitted giving a statement that the defendant told her that he had raped and robbed a woman. Later on, Rogers claimed she signed the statement only because investigators threatened to take her child away. Rogers also testified that she had previously seen defendant with a .38-caliber snub-nose revolver.
Dennis Aubuchon, a forensic scientist, testified that he found seminal fluid on the vaginal swab and smear contained in the Vitullo rape kit. After analyzing blood and saliva samples taken from defendant, Aubuchon concluded that defendant was a nonsecreter, meaning his blood type would not be reflected in his bodily secretions such as sweat, saliva, or semen. Aubuchon concluded that defendant could not be excluded as the donor of the semen found in the victim. According to Aubuchon, approximately 30% of the black population are nonsecreters. Defendant is black. Aubuchon further testified that Kenneth Chaney, also a black man, was a nonsecreter as well.
The defense called Phyllis Childers as an alibi witness. Childers is defendant's relative and neighbor. Childers testified that the defendant was at her home on the night of December 13-14, 1984, and that defendant did not leave until the following morning sometime between 7:00 and 8:30 a.m. Childers testified that she, the defendant, and several others spent the night "drinking and getting high." Childers testified that her sister, Senatta Bland, and the defendant fell asleep in the basement *1378 of the home early in the morning of December 14. According to Childers, the defendant and Bland were asleep when Childers left at approximately 4:30 or 5 a.m. to get milk coupons for her children and the two were still sleeping when Childers returned at 8 a.m. Timothy Gully, defendant's brother, who was in the home part of that time, corroborated Childers' testimony. On cross-examination, Childers denied that she had made a prior statement placing defendant in her home overnight in either the month of October or November rather than December.
Defendant testified in his own behalf. He stated that on the night of December 13-14, 1984, he split his time between Rogers' home, his home, and the Childers' home. He further testified that he was at his home on December 13 from noon until 9:30 p.m. and that he arrived at the Childers' home at "exactly" 9:30 p.m. and stayed there all night. He later testified that he did not go to the Childers' home until approximately 12:30 a.m. on the morning of December 14. At another point, he testified that he had been at Rogers' home from some time in the afternoon of December 13 until 7 or 8 o'clock that evening. He further admitted that he had previously told investigators that he had spent the entire night with Rogers and had never left the house and that Rogers would corroborate his story.
Defendant further testified that he had taken no part in the robbery and assault on December 14. He denied making inculpatory statements to Wilson and Lewis. Defendant testified that Chaney gave him the jewelry, which defendant agreed to hold until Chaney paid off a preexisting debt to defendant. Defendant disclaimed any knowledge that the jewelry has been stolen. Defendant's 10-year-old brother, Perry Gully, testified that Chaney had brought jewelry to the Gully home about a week before Christmas 1984.
In rebuttal, investigators Robyn Blaha and Ed Muzzey testified that when they interviewed Phyllis Childers about a week prior to trial, she remembered drinking with defendant one night and that defendant had ended up staying overnight in her home sometime before Thanksgiving, possibly in October 1984.
After deliberating approximately 12 hours, the jury returned verdicts of guilty on all three counts. The convictions were upheld on direct appeal. (People v. Gully (1986), 151 Ill.App.3d 795, 104 Ill.Dec. 431, 502 N.E.2d 1091.) Defendant now appeals the circuit court's order denying his petition for post-conviction relief.
Defendant first claims he was denied a fair trial when the trial prosecutor violated the advocate-witness rule in the cross-examination of alibi witness Phyllis Childers and in the prosecutor's failure to perfect the impeachment of Childers.
The advocate-witness rule precludes an attorney from acting as advocate and witness in the same case. (See People v. Janes (1985), 138 Ill.App.3d 558, 566-67, 93 Ill.Dec. 216, 222, 486 N.E.2d 317, 323.) The rule reflects the inconsistency between the role of an advocate and that of a witness; the function of an advocate is to advance or argue the cause of another, while that of the witness is to state the facts objectively. (Janes, 138 Ill.App.3d at 567, 93 Ill.Dec. at 222, 486 N.E.2d at 323.) The rule, however, is not absolute. A prosecuting attorney may testify in a criminal case in which he is engaged if, in the discretion of the trial court, such testimony is necessary. Janes, 138 Ill.App.3d at 567, 93 Ill.Dec. at 222, 486 N.E.2d at 323.
Here, the defendant contends the prosecutor violated the rule when she cross-examined defense witness Phyllis Childers about a prior conversation between Childers and the prosecutor. On direct examination, Childers provided defendant with an alibi when she testified that defendant spent the evening of December 13-14 at her home. Obviously, if defendant spent the night at Childers' home, he could not have been one of the participants in the robbery and assault. On cross-examination, the prosecutor questioned Childers about a conversation they had had several days prior to trial. The pertinent testimony is as follows:

*1379 "Q. [Assistant State's Attorney] Do you recall our conversation that we had?
A. [Phyllis Childers] Yes, I do.
Q. And do you recall what you told me about this particular date?
A. Yes, I do.
Q. And what do you recall telling me?
A. I told you that I leftI left and returned. I left about the 25th of December and I returned the first part of the year. And you asked me did Leon call me and have me say anything or something.
Q. About this night that Leon was with you the whole night, spent the whole night with you, ate dinner with you, do you recall telling me when that happened, what date that was?
A. No, because you didn't ask me.
Q. Do you recall telling me it had to be some time in October?
A. No, I recall telling you it was cold.
Q. You recall telling me it was some time in October, that it was definitely before Thanksgiving?
A. No, I didn't tell you that.
Q. Do you recall telling me that you left November 18 for Springfield and did not return until some time
A. I recall I told you I left November 18 and I returned back. The 25th of December I left again and I also returned back the first part of the year.
Q. You left November 18?
A. I come back about the 20th something of December. Then I went back.
Q. When did you leave for Springfield? Do you recall telling me it was November 18 that you left for Springfield.
A. Yes, I do.
Q. And you came back December 25.
A. No, I don't recall telling you that.
Q. Did you just say that you came back December 25?
A. I said I left November 18. I come back the 20th something of November. I turned around and left again December 20 something. That's what I said.
Q. Do you recall telling me that you wereyou left in November for Springfield and you were gone until some time late in December?
A. No. I don't recall telling you that. I didn't tell you that.
Q. So today you are able to remember December 13?
A. I remember it because the 14th I had to pick up my kids' milk coupons and I had to go back across the street where my sister lives with my mom at the other house to get the appointment slip and the card I have to pick the coupons up. That's how I know Leon was still there because I went in the basement.
Q. Regarding this particular night, the night you had been with Leon all evening, do you recall telling me the reason why you remember that night is because Leon had called you and told you about that night?
A. No, I don't. You asked me did Leon call me. Them was your words. You asked me those.
Q. What did you tell me?
A. I told you, `No, I haven't talked to Leon.' That's what I told you. And you told me that you would be the one prosecuting me or something. I said, `I don't care.' That's what I said."
Clearly, the prosecutor was attempting to impeach Childers with her prior inconsistent statements that defendant spent the night in her home in November or October rather than December 1984. Generally, impeachment of a witness with a prior inconsistent statement is a proper trial tactic. (See People v. Batchelor (1990), 202 Ill.App.3d 316, 147 Ill.Dec. 608, 559 N.E.2d 948.) Defendant contends that such impeachment is improper in the instant case since the prior statements were made to the prosecutor rather than a third party. Defendant asserts that when the prosecutor asked Childers whether she recalled making the prior statements to the prosecutor by asking, "Do you recall telling me * * *?" the prosecutor was essentially saying "You told me * * *." Defendant argues that this improper questioning transformed the prosecutor into a witness even though she did not actually take the stand. Defendant maintains the error was *1380 compounded when, during closing argument, the prosecutor again brought up Childers' prior inconsistent statements:
"Do you really believe that Leon Gully was at home all night with his mother and family until 12:30? Is it interesting to you that it totally contradicts the evidence of Phyllis who he was supposed to be with all day, drinking with, going to dinner with, who when I talked to on Friday thinks the date is sometime in October and tells us that it was from a call from Leon Gully that she knows what date to remember and then today can testify that she is positive that it was December 14 and December 13? Was she credible to you?"
Defendant contends that in addition to violating the advocate-witness rule, the prosecutor erred in failing to perfect the impeachment of Childers with the rebuttal testimony of Agents Blaha and Muzzey, thus depriving him of his right to a fair trial. The prosecutor asked Childers about three prior inconsistent statementsthat defendant spent the night at her home in November or October 1984; that Childers was out of town on December 13 and 14, 1984; and that defendant telephoned Childers and told her he spent the night of December 13-14, 1984, at her home. The witness denied making any of these statements. In an attempt to rebut this testimony, the prosecutor called Agents Blaha and Muzzey, who both witnessed the conversation between the prosecutor and Childers. Both agents testified that Childers said she thought defendant had spent the night at her house prior to Thanksgiving 1984, possibly in October. However, neither witness related anything about the prosecutor's claim that Childers had said she was out of town on December 13-14, 1984. With respect to the prosecutor's suggestion that defendant told Childers that he spent the night of December 13-14 at her home, the agents testified that Childers had said defendant called her to ask Childers if she remembered the time they (Childers and defendant) were at her home drinking together, but the agents did not testify that Childers had said defendant had given her the December dates. Defendant contends that as the prosecutor completed impeachment with respect to only one of the prior inconsistent statements, but not the other two, the aborted impeachment deprived him of the right to a fair trial. Lastly, defendant contends that as the evidence in this case was closely balanced, the prosecutor's misconduct was especially damaging to the defense because Childers was a crucial witness; the improper treatment of Childers deprived defendant of critical alibi testimony.
We must note that the alleged prosecutorial misconduct of which defendant now complains was not objected to at trial, raised in defendant's post-trial motion, raised on direct appeal, or raised in defendant's pro se or amended post-conviction petitions. As the issue was not raised in defendant's amended post-conviction petition, the issue is waived. (Ill.Rev.Stat. 1991, ch. 38, par. 122-3.) As the State accurately notes, the alleged prosecutorial misconduct was apparent of record and therefore could have been raised as an issue on direct appeal. The judgment of the reviewing court on appeal is res judicata as to all issues decided, and any claim that could have been presented on direct appeal is, if not presented, thereafter barred under the doctrine of waiver. People v. Silagy (1987), 116 Ill.2d 357, 365, 107 Ill.Dec. 677, 680, 507 N.E.2d 830, 833.
Defendant invokes the plain-error doctrine as a vehicle to review the claim of prosecutorial misconduct. The plain-error rule permits a court on direct appeal to take notice of plain errors and defects affecting substantial rights which were not brought to the attention of the trial court. (People v. Owens (1989), 129 Ill.2d 303, 316, 135 Ill.Dec. 780, 785, 544 N.E.2d 276, 281.) However, the rule cannot be used to consider procedurally defaulted claims when defendant collaterally attacks his conviction or sentence under the Post-Conviction Hearing Act (Ill.Rev.Stat.1991, ch. 38, par. 122-1 et seq.). (Owens, 129 Ill.2d at 316, 135 Ill.Dec. at 785, 544 N.E.2d at 281.) Use of the plain-error rule to review procedurally defaulted claims raised for the first time in a post-conviction petition would nullify *1381 the affirmance obtained on direct appeal. (See Owens, 129 Ill.2d at 316-17, 135 Ill.Dec. at 785, 544 N.E.2d at 281.) Procedurally defaulted claims may be reviewed in post-conviction proceedings only when fundamental fairness so requires; the principle of fundamental fairness applies only when a defendant shows cognizable "cause" for failure to make a timely objection and shows "actual prejudice" flowing from the errors of which he now complains. (Owens, 129 Ill.2d at 317, 135 Ill.Dec. at 780-86, 544 N.E.2d at 276-82.) To satisfy the "cause and prejudice" standard, defendant must show not simply that the errors created a possibility of prejudice but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimension. (Owens, 129 Ill.2d at 317-18, 135 Ill.Dec. at 786, 544 N.E.2d at 282.) We do not believe defendant has demonstrated that the alleged prosecutorial misconduct worked to his actual and substantial disadvantage such that it infected the entire trial with an error of constitutional magnitude.
Defendant also alleges ineffective assistance of trial and appellate counsel for failure to preserve the issue of prosecutorial misconduct or raise the issue on direct appeal. We note that although defendant's post-conviction petition did assert ineffective assistance of trial and appellate counsel, the specific allegations of incompetence contained in the petition were not those now raised on appeal and, therefore, the trial court did not consider these allegations during the hearing on defendant's post-conviction petition. As the claim of ineffective assistance of trial and appellate counsel for failure to raise the issue of prosecutorial misconduct below or on appeal was not included in the amended petition for post-conviction relief, the claims are waived for purposes of review. Ill.Rev. Stat.1991, ch. 38, par. 122-3.
Finally, defendant asserts ineffective assistance of post-conviction counsel for failure to include the issue of prosecutorial misconduct in the amended petition for post-conviction relief. We address the substance of this claim but only within the context of the claim of incompetence of post-conviction counsel. (See People v. French (1991), 210 Ill.App.3d 681, 689, 155 Ill.Dec. 457, 462, 569 N.E.2d 934, 939.) While not expressly stated, defendant implies that post-conviction counsel was deficient for failure to amend the petition to allege ineffective assistance of trial and appellate counsel for their failure to raise the issue of prosecutorial misconduct.
While a defendant has a statutory right to a reasonable level of assistance in a post-conviction proceeding, there is no constitutional right to assistance of post-conviction counsel. (People v. Owens (1990), 139 Ill.2d 351, 359, 151 Ill.Dec. 522, 527, 564 N.E.2d 1184, 1189; Williams v. Chrans (7th Cir.1991), 945 F.2d 926, 932.) The entitlement to a reasonable level of assistance in a post-conviction proceeding is not coextensive with the constitutional right to assistance of trial counsel. (Owens, 139 Ill.2d at 364, 151 Ill.Dec. at 527, 564 N.E.2d at 1189.) This is because trial counsel acts as a shield to protect defendant from being "haled into court" by the State and stripped of his presumption of innocence. (Owens, 139 Ill.2d at 364, 151 Ill.Dec. at 528, 564 N.E.2d at 1190.) However, a post-conviction petitioner has already been stripped of the presumption of innocence and has generally failed to obtain relief on direct review. Post-conviction counsel is appointed not to protect the petitioner from the prosecutorial forces of the State but to shape his complaint into the proper legal form and to present those complaints to the court. (Owens, 139 Ill.2d at 364-65, 151 Ill.Dec. at 528, 564 N.E.2d at 1190.) The record in the instant case reveals that defendant's post-conviction attorney consulted with him, examined the record of the trial proceedings, and filed an amended post-conviction petition and several supplements thereto. Defendant now alleges appointed counsel was incompetent for failure to include in the amended petition a claim of prosecutorial misconduct. However, there is no requirement that post-conviction counsel must amend the petition to include a certain claim. (People v. Spreitzer (1991), 143 Ill.2d 210, 221, 157 Ill.Dec. 467, 472, 572 N.E.2d 931, 936.) In order to show inadequate representation, a *1382 defendant must show that the petition could have been amended to state a case upon which relief could be granted. People v. Wren (1992), 223 Ill.App.3d 722, 731, 166 Ill.Dec. 194, 200, 585 N.E.2d 1216, 1222.
We do not believe that the petition would have stated a case upon which relief could have been granted even if post-conviction counsel had amended the petition to include a claim of constitutional error in the prosecutor's alleged violation of the advocate-witness rule and incomplete impeachment of alibi witness Phyllis Childers. Assuming, arguendo, the prosecutor violated the advocate-witness rule, we believe any error was harmless. While defendant argues the prosecutor's conduct deprived him of the benefit of crucial alibi testimony, we note that defendant's testimony was not necessarily consistent with the alibi provided by Childers. Defendant has failed to demonstrate any actual prejudice resulting from the alleged violation. People v. Langdon (1980), 91 Ill.App.3d 1050, 1057, 47 Ill.Dec. 573, 579, 415 N.E.2d 578, 584.
The same applies with respect to the alleged incomplete impeachment of Childers. On direct examination, Childers testified that defendant spent the night at her home on December 13-14, 1984. On crossexamination, the prosecutor questioned her about three alleged prior inconsistent statements, that is, that defendant spent the night at her home sometime before Thanksgiving 1984, that Childers was out of town on December 13-14, and that defendant had telephoned her and told her he spent the night of December 13-14 at her home. Childers denied that she made these prior statements. Blaha and Muzzey both testified that Childers had said defendant had spent the night at her house prior to Thanksgiving 1984, possibly October. Blaha also testified that Childers had stated that defendant had contacted her and asked her if she remembered one particular occasion when they had been drinking at her residence. Childers responded that she did remember drinking with defendant on one particular occasion at which time defendant asked her if she could verify that he was with her at the residence at that particular time. Childers stated that she was not sure but believed that particular time was before Thanksgiving, possibly in October. The agents provided no testimony as to Childers being out of town at the time the offenses were committed, but we believe this error was harmless as Childers was so thoroughly impeached with two of her three prior inconsistent statements. Finally, we note that Childers' alibi testimony was not necessarily consistent with defendant's testimony. Childers testified that defendant arrived at her home at 12:30 p.m. on the afternoon of December 13 and stayed there all night. She testified that he never left her home, except for a 30-minute period sometime between 8:00 and 9:00 p.m. Defendant testified that he was at home on December 13 from noon until 9:30 p.m. when he went to the Childers' home. He also testified that he did not reach the Childers' home until 12:30 a.m. on the morning of December 14. He further admitted that he has previously told investigators that he spent the entire night of December 13-14 with Rachelle Rogers.
With respect to the prosecutor's alleged inflammatory statement attacking the credibility of Childers during closing argument, we find no error as the jury was instructed that closing argument does not constitute evidence. The jury instruction cured any possible prejudice. People v. Spann (1981), 97 Ill.App.3d 670, 678, 52 Ill.Dec. 842, 849, 422 N.E.2d 1051, 1058.
In sum, we cannot find that post-conviction counsel was incompetent for failure to amend the petition to include a claim of prosecutorial misconduct. Even assuming such misconduct, it did not amount to reversible error, as evidence of defendant's guilt was overwhelming. The victim saw her assailant "Leon" three times during the robbery and assault which took place on December 14, 1984. Furthermore, the victim identified defendant from a 60-photograph array two weeks after the incident. At trial, the victim identified defendant with "absolute certainty." Two witnesses testified that defendant admitted his participation in the crimes to them. Defendant's girl friend, Rachelle Rogers, testified that defendant told her he had robbed a woman. Rogers had previously seen defendant with a .38-caliber snub-nose revolver, a type of *1383 gun used in the offense. Rogers sold the victim's jewelry to Susanna Davis. Furthermore, at the time of his arrest, defendant lied to police, telling them his name was Timothy Gully rather than Leon Gully. Additionally, there was testimony that defendant contacted a witness and asked him not to testify. Lastly, defendant's testimony was not consistent with the alibi provided by Childers.
Finally, defendant claims he was denied a fair trial when the prosecution presented the inflammatory expert opinion testimony of Dennis Aubuchon. Aubuchon compared a semen sample taken from the victim with blood and saliva samples taken from defendant. He testified that defendant was a nonsecreter, meaning that defendant's blood type would not be reflected in his bodily secretions. Aubuchon concluded that defendant could not be excluded as the donor of the semen taken from the victim. He noted that 30% of the black population were nonsecreters.
Defendant contends this testimony was inflammatory and completely irrelevant to any disputed issue at trial. This issue is subject to the analysis presented above. The issue is waived for failure to include it in the amended post-conviction petition. (Ill.Rev.Stat.1991, ch. 38, par. 122-3.) Additionally, post-conviction counsel was not ineffective for failure to raise the issue in the amended post-conviction petition, as inclusion of the issue would not have stated a claim upon which relief could have been granted. As inclusion of the issue would not have warranted relief, trial and appellate counsel were not ineffective for failure to raise it below or on direct appeal. See People v. Albanese (1984), 104 Ill.2d 504, 85 Ill.Dec. 441, 473 N.E.2d 1246.
We affirm the trial court's order denying defendant's petition for post-conviction relief.
Affirmed.
WELCH and WILLIAM A. LEWIS, JJ., concur.